UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIANDRA GURNE,

        Plaintiff,

v.

MICHIGAN BELL TELEPHONE CO. d/b/a
AT&T,

        Defendant.

_____/

Case No. 10-14666

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [18] AS TO PLAINTIFF'S FMLA CLAIMS AND GRANTING
DEFENDANT'S MOTION AS TO PLAINTIFF'S BULLARD-PLAWECKI EMPLOYEE
RIGHT TO KNOW ACT CLAIM**

This employment dispute comes before the Court on Defendant Michigan Bell Telephone Co. d/b/a AT&T ("AT&T")'s motion for summary judgment. In March 2010, Plaintiff Diandra Gurne, an employee at Defendant's Port Huron call center, was approved for intermittent leave under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et. seq.*. She was terminated by Defendant for FMLA fraud on June 17, 2010, based on another employee's allegations that Plaintiff was seen at a birthday party during the late afternoon of April 10, 2010, a day she called-in and took as intermittent FMLA leave. Plaintiff consistently asserted that she did not leave her home until after her scheduled shift had ended and her condition had improved, but another employee, Kari Hasler, told Defendant otherwise. Defendant denied four hours of Plaintiff's requested FMLA leave on May 11, 2010, and ultimately terminated her on June 17, 2010 based on its determination

that she lied about the need for FMLA leave, committed FMLA fraud, and thus violated Defendant's Code of Business Conduct.  Plaintiff subsequently filed this suit alleging that Defendant violated the FMLA when it interfered with her right to use her approved intermittent leave and retaliated against her for exercising her FMLA rights.[1]  For the reasons stated below, Defendant's motion as to Plaintiff's FMLA claims is DENIED.

## I.   Background

Plaintiff is a 31 year old former employee of Defendant AT&T.  (Pl.'s Dep. at 20.)  She began working for Defendant in September 2001 as an hourly consumer product specialist in Defendant's Port Huron Call Center.  Her job duties included taking incoming customer calls including those addressing problems, questions, and concerns about AT&T's internet services, and selling other AT&T services and products under strict time limitations and in a high-stress environment.  (Pl.'s Dep. at 30, 36-37; Zmud Dep. 12-13.)

In 2005, Plaintiff's treating physician at the time, Dr. Laura Lucio-Reincke, diagnosed her with the chronic conditions of migraines and anxiety.  (Pl.'s Dep. at 7-9.)

### A.   March 2010 - Plaintiff Approved for Intermittent FMLA Leave

In March 2010, Dr. Lucio-Reincke certified Plaintiff for intermittent FMLA leave for 36 hours of leave per month.  (Pl.'s Ex. 4, 3/17/10 FMLA Certification of Health Care Provider.)

### B.   April 9, 2010 - Vacation Day to Visit New Doctor

---

[1]Plaintiff's complaint also alleges that Defendant violated Michigan's Bullard-Plawecki Employee Right to Know Act, Mich. Comp. Laws § 423.501, *et seq.*, when it willingly and knowingly failed to comply with her written request for her personnel file.  Plaintiff has subsequently received her personnel file, does not raise this claim in her response, and thus has apparently abandoned this claim.  Accordingly, Defendant's motion is GRANTED as to this claim.

In April 2010, Plaintiff's migraines increased in both frequency and severity.  She was also suffering from insomnia.  So, she sought out and began treatment with a new physician, Dr. Peter Cavataio.  (Pl.'s Dep. at 9-10, 52.)

On Friday, April 9, 2010, Plaintiff used a vacation day to go to an appointment with Dr. Cavataio, who diagnosed her with suffering from depression as well as anxiety and migraines.  (Pl.'s Dep. at 9, 69.)  Dr. Cavataio doubled the dose of Effexor that Plaintiff was currently prescribed and advised her to continue taking her Midrin and Xanax prescriptions as needed.  (Pl.'s Dep. at 53; Pl.'s Ex. 5, Dr. Cavataio Aff. at ¶¶ 6, 9-10.)  He advised Plaintiff that increasing Effexor could cause side effects that included nausea, blurred vision, dizziness, and trouble sleeping.  He recommends that, if patients do experience these side effects, they should not operate a vehicle or work until the side effects subside.  (Dr. Cavataio Aff., ¶¶ 11-12.)  That night, Plaintiff took her first increased dose of Effexor as well as her regular dose of Midrin and Xanax because she was suffering from a migraine.  (Pl.'s Dep. at 55-56.)

### C.  April 10, 2010 - FMLA Leave - Woolvett Party - Time Dispute

On Saturday, April 10, 2010, Plaintiff woke up and was not feeling well.  She hadn't slept well, was nauseated, dizzy, and had blurred vision.  She assumed it was a result of the medications she had taken the night before.  She called into work before her scheduled 8:30 a.m. to 5:00 p.m. shift and notified Defendant employer that she was not feeling well, was taking a FMLA leave day, and would not be at work until she felt better.  (Pl.'s Dep. at 58.)

After the call to Defendant, Plaintiff laid down for a few hours.  When she got up, she still did not feel better, was still suffering from nausea and blurred vision, and took a Midrin

for her migraine but did not take any more Effexor or Xanax.  (Pl.'s Dep. at 60-61.)  She continued to rest, did not talk on the phone, did not leave her home, and her husband cared for her three children that day.  Her symptoms of nausea and blurred vision continued on and off throughout the day.  (Pl.'s Dep. at 61-63.)

This case revolves around a dispute whether Plaintiff, along with her husband and three children, left her home on April 10th before her scheduled shift ended at 5:00 p.m. to attend a birthday party for a co-worker's husband.  Plaintiff consistently claimed that she did not leave her home until 5:30 p.m.  An AT&T work-force manager, Kari Hasler, claimed otherwise.  The Central Sales Manager at Defendant's Port Huron Call Center, Richard Phillips, summarized his conclusions after Plaintiff, Kari Hasler, and other employees were interviewed on May 3, 2010 by an investigator hired by Defendant:

> What I knew, I had in front of me, was a she said/she said, and that just needed to be looked into further. . . .  [W]e have a statement from a management employee who observed her, we have a statement from Diandra who is saying that's not true and we have Marybeth Wolvett [another co-worker and host of the birthday party] who comes in and says I can't say for sure. . . .  So I thought this needs to be looked into further.

(Phillips Dep. at 66-67.)

Plaintiff consistently testified as follows.  Around 5:30 p.m., she left her home with her husband and three children to attend a birthday party for a co-worker's husband, and arrived at a few minutes before 6:00 p.m.  The nausea she had experienced earlier was still occurring occasionally, and she was tired.  (Pl.'s Dep. at 62-63.)  At around 6:15 p.m., she saw a co-worker, Kari Hasler, an AT&T work-force manager, arrive at the party.  Hasler was also with her husband and children.  (Pl.'s Dep. at 66.)  Plaintiff admitted that she had a conversation with the host, co-worker Marybeth Woolvett, and asked her how it was that

4

Hasler was invited to the party.  Plaintiff denied that she was upset that Hasler was there. She told Marybeth that she took a vacation day on Friday to see a new doctor, that he increased her medicine, and she didn't go to work that day, Saturday.  Marybeth told her that none of that should matter because she was at the party after her shift.  Plaintiff admitted that she "thought about" whether her being at the party the same day she had taken FMLA leave would be a concern but determined it would not be an issue and she would not get in trouble at work because she had not done anything wrong, was under the care of her physician, was getting her medication, and following up with him.  (Pl.'s Dep. at 66-71.)  Plaintiff left the party at around 8:30 p.m.  (Def.'s Ex. G, Meisnitzer Report at 5.)

As illustrated below, Kari Hasler was inconsistent about the time that she saw Plaintiff at Marybeth Woolvett's party – her initial email on April 12, 2010 stated she saw Plaintiff between 4:30 p.m. and 6:30 p.m. and her later email on April 30, 2010 stated she saw Plaintiff around 4:00 p.m. and that Plaintiff was still there when she left the party around 5:00 p.m. (*Compare* Def.'s Ex. E *with* Pl.'s Ex. 9.)

**D.  April 12, 2010 - FMLA Fraud Investigation Begins**

On Monday, April 12, 2010, Plaintiff went to work as scheduled.  (Pl.'s Dep. at 89-90.) That same day, Kari Hasler reviewed the Port Huron Call Center's  spreadsheet listing the call-ins for Saturday, April 10, 2010, with the Attendance Manager, Tracy Glenn.  Ms. Hasler noticed Plaintiff's name on the list and told Ms. Glenn that she saw Plaintiff at a party on Saturday, April 10th.  Glenn testified that "we determined it was during [Plaintiff's] work schedule."  (Glenn Dep. at 30.)  Ms. Glenn asked Hasler to put this information in an

email and send it to her.  Ms. Hasler did as she was asked.  (Glenn Dep. at 15, 18, 28-29.)

Her email stated:

> Tracy,
>
> 04/10/2010 - Saw Diandra Gurne with her 2 children out on Graham road between the hours of 4:30 p.m. - 6:30 p.m.  She was there for a 30th birthday party.  I do not know how long she was there before I got there.  There were approximately 25 people on the property.
>
> We did talk so I am 100% sure it was her.
>
> Kari

(Def.'s Ex. D, 4/12/10 email) (emphasis added).

On April 12, 2010, after Tracy Glenn got Hasler's email and without contacting Plaintiff or anyone else, Ms. Glenn submitted a Request for Investigation ("RFI") form to Shannnel Sykes in Defendant's Human Resources Department.  (Glenn Dep. at 30, 42-44; Pl.'s Ex. 7, 4/12/10 RFI form.)  Ms. Glenn filled in Section 3 of the form titled "Reasonable Suspicion of Fraud for initiating allegation" as follows:

> I would like to request surveillance and an Asset Protection interview for this employee [Plaintiff] due to her being seen at a party on 4/10/2010 at approximately 4:30 p.m. (her tour was 8:30am-5:00pm that day).  She was seen by our force manager Kari Hasler, her [sic] is the statement Kari provided me "4/10/2010 - Saw Diandra Gurne with her 2 children out on Graham road between the hours of 4:30pm - 6:30pm. . . . ."  Based on this information and the fact that she has a pattern of taking time off around her off days and vacation (see attached schedule), I would like Asset protection involvement.

(Pl.'s Ex. 7, 4/12/10 RFI form at 2, ¶ 3) (emphasis added).

Defendant's Human Resources Department forwarded the Request for Investigation form to Mary Glass, a Manager in FMLA operations who handles RFIs alleging FMLA fraud, reviews Section 3, and determines if further investigation is warranted.  (Glass Dep. at 5-6, 12-13.)  If Ms. Glass determined that further investigation was warranted, she would  send

6

it along to an asset protection investigation, and let the individual who submitted the RFI know that the request was granted.  (Glass Dep. at 13-16, 37.)

On April 12, 2010, in response to Ms. Glenn's RFI, Ms. Glass recommended an interview but no surveillance, noting on the RFI form that "Exact time [Plaintiff] arrived at the party is not known" because the time frame of between 4:30 p.m. to 6:30 p.m. was "not an exact time."  (Pl.'s Ex. 7, RFI form, ¶ 4, "Additional Information to Concur/Decline the Reasonable Suspicion of Fraud;" Glass Dep. at 77-78.)   She also completed another section of the RFI, "Description of Restriction," with generic information about migraines that was not specific to Plaintiff's medical restrictions provided by her physician for her migraine and anxiety conditions.  (Pl.'s Ex. 7, RFI form, ¶ 6; Glass Dep. at 80-81, 84-85.)

On April 12, 2010, Ms. Glass also indicated on internal records that a decision on Plaintiff's FMLA leave for 8 hours on April 10, 2010 was "pending" in light of the RFI and decision to investigate.  (Glass Dep. at 51-54, 65-70.)

By April 13, 2010, Defendant's investigation of Plaintiff had begun.  The lead investigator for Defendant, Paul Meisnitzer, received the RFI and sent an email to Ms. Glass confirming that fact.  (Def.'s Ex. G, Meisnitzer Invest. Rpt. at 19.)

On April 16, 2010, Mr. Meisnitzer ("the Investigator") contacted the Manager at Plaintiff's workplace, Richard Phillips.  Mr. Phillips agreed to tell Kari Hasler that Meisnitzer was conducting an investigation into Plaintiff's April 10th absence and that she should submit all information and documentation she had on the subject to him.  Phillips also agreed to tell Tracy Glenn to keep Meisnitzer informed of Plaintiff's absences so he did not drive out to Port Huron to interview her when she was not there.  (Meisnitzer Dep. at 43-44.)

7

On April 28, 2010, Kari Hasler was at the desk of a co-worker, Connie Hayes.  Ms. Hayes asked Hasler if she saw Plaintiff at a party on a Saturday, and Hasler asked her why she wanted to know.  Connie Hayes told Kari Hasler that the party's host, Marybeth, had come to her in confidence.  Connie Hayes and Kari Hasler discussed Connie's confidential conversation with Marybeth.  Connie then went to Tracy Glenn and ultimately submitted an email to Glenn that memorialized her conversation with Marybeth.  Ms. Glenn then forwarded Connie's email to Investigator Meisnitzer.  (Pl.'s Ex. 9, Hasler 4/30/10 email to Investigator Meisnitzer; Def.'s Ex. H, 4/29/10 email from Connie to Tracy Glenn and 4/29/10 email from Glenn to Meisnitzer; Glenn Dep. at 51-52.)  Ms. Glenn never spoke with Marybeth about the contents of Connie's email.  (Glenn Dep. at 52.)

Connie's email discusses what Marybeth recently told her in confidence about events that occurred at a birthday party she threw for her husband:

> She told me that one of the guests invited was a friend of hers, Diandra Gurne. While at the party another employee Kari Hasler, showed up with her husband who also works with Marybeth's husband.  MaryBeth said she didn't think anything of the fact that Kari and her husband were there and things were going as planned.  Marybeth told me that she went into a separate room to change her child's clothes and Diandra came in very upset.  She said that Diandra wanted to know why Kari was there and had told her that she was on FMLA leave that day.  Marybeth also said that Diandra appeared to be upset with her for inviting Kari to the party that Diandra was invited to.  At this point MaryBeth told Diandra that she had no idea it was a problem because she didn't know that Diandra would call in sick to come to the party.  MaryBeth then told me that she is sick and tired of Diandra getting away with things like this and is not going to feel guilty about it.  I assured MaryBeth that she did nothing wrong and not to worry because it's not her fault.
>
> <u>At no point in the conversation did MaryBeth give me a time or date that this took place.</u>
>
> Connie Hayes

(Def.'s Ex. H, 4/29/10 email from Hayes to Glenn re: "Diandra Gurne situation" and 4/29/10 email from Glenn to Meisnitzer) (emphasis added).

On April 30, 2010, Investigator Meisnitzer interviewed Kari Hasler via telephone.

On April 30, 2010, Kari Hasler sent an email to Investigator Meisnitzer stating that, at Marybeth's party on April 10, 2010, she saw Plaintiff around 4:00 p.m., that Plaintiff was still there when she left the party around 5:00 p.m., that Hasler learned on the following Monday when going through the call-outs for the weekend that she saw Plaintiff during her scheduled work hours while she was out on FMLA leave, and that she had not spoken with Plaintiff about "this incident."  (Pl.'s Ex. 9, 4/30/10 email (emphasis added).)

**E.  May 3, 2010 - Interviews and Suspension Pending Further Investigation**

On May 3, 2010, Investigator Meisnitzer came to Defendant's Port Huron Call Center and interviewed Plaintiff, Kari Hasler, Connie Hayes, and Marybeth Woolvett.  Manager Richard Phillips was present during the majority of Plaintiff's interview, during the entire interview of Marybeth Woolvett, and may have been present during the interview of Connie Hayes.  The investigator had also briefed him on all the information he had already gathered, i.e., the above emails and RFI information.  (Meisnitzer Dep. at 44-46.)

On May 3, 2010, in addition to her interview, Kari Hasler also sent an email to Investigator Meisnitzer, Richard Phillips and Tracy Glenn.  The email gave a list of calls and texts sent between Kari Hasler and her husband on the evening of April 10, 2010.  Ms. Hasler stated that a call made at 5:23 p.m. was to let her husband know she was home, and the remaining 21 texts from 5:23 p.m. to 8:10 p.m. were sent to him after she was home.  (Pl.'s Ex. 8, 5/3/10 email from Hasler.)  Investigator Meisnitzer did not ask Kari Hasler how she could verify that the call/texts were made while she was at home as

9

opposed to while she was at the party and did not question her about the time discrepancies in her emails stating when she saw Plaintiff.  (Meisnitzer Dep. at 62-65.)

Meisnitzer's interview of Connie Hayes rehashed her conversation with Marybeth Woolvett memorialized in Hayes's April 28, 2010 email.  Pertinent here, Meisnitzer notes that "Woolvett did not inform [Connie] of what time [Plaintiff] and/or Hasler attended the party."  (Def.'s Ex. G, Report of Personnel Investigation at 4.)

During her interview, Plaintiff stated that she was home all day until 5:30 p.m. when she, her husband and their three children left to go to the Woolvett birthday party.  Plaintiff told him that she saw Kari Hasler arrive shortly after she did, around 6:15 p.m.  Plaintiff remained at the party until around 8:30 p.m.  (*Id.* at 5.)  Plaintiff could not explain why Hasler said she arrived at a different time and stated that "Hasler must be out to get her." (*Id.*)  Although Investigator Meisnitzer testified that the medical restrictions listed on the RFI had "a significant effect on the type of questions" he may ask, he admitted that he was unaware of Plaintiff's medical conditions or her medical restrictions and did not ask Mary Glass about the medical restrictions listed on the RFI.  (Meisnitzer Dep. at 67-73.)

Meisnitzer also interviewed Marybeth Woolvett who stated that "she was not exactly sure when [Plaintiff] got there," but she "thought it was sometime later in the afternoon/evening." (*Id.*)  Woolvett stated Hasler arrived shortly after Plaintiff did.  She also stated that Plaintiff told her shortly after she arrived that she had taken a vacation day "today," and came up to her later in the evening, seemed upset, and questioned Woolvett as to why Hasler was invited to her party.  Woolvett got the feeling that Plaintiff thought she had been set up or tricked by Woolvett's invitation to Hasler.  Woolvett also stated that

10

Plaintiff apologized to her, told her that she had lied about taking a vacation day, and admitted that she had actually taken a FMLA leave day.  (*Id.* at 5-6.)

Richard Phillips was present for these interviews because Plaintiff's immediate supervisor, Sean Brister, was off that day.  After the interviews were completed, he asked Tracy Glenn, the attendance manager, to prepare a letter informing Plaintiff that she was being suspended pending further investigation, and Plaintiff was escorted out of the building.  (Phillips Dep. at 64; Def.'s Ex. G, Meisnitzer Investigative Rpt. at 23; Pl.'s Dep. at 103.)

Phillips denied that, by suspending Plaintiff, he had chosen to believe Kari Hasler over Plaintiff.  He insisted a firm decision could not be made at that point and further investigation was required because the situation was unclear -- a management employee insisted she saw Plaintiff at time X and Plaintiff insisted she was there at time Y and a third party, Marybeth, said she simply could not say for sure what time Plaintiff was there.

> What I knew, I had in front of me, was a she said/she said, and that just needed to be looked into further.  Plus, this employee didn't report to me.  And I would have been disappointed in one of my peers if they were filling in for me and they dismissed one of my employees without letting me review that first.
>
> The proper path there, with her second-level supervisor, Sean Brister, being out of the office and me being in the situation where I witnessed the interview, we have a statement from the management employee who observed her, we have a statement from [Plaintiff] who is saying that's not true and we have Marybeth Woolvett who comes in and says I can't say for sure.
>
> I couldn't make a firm decision at that point, nor would I do it anyway, because she didn't directly report to me.  I would have referred that to my peer, Sean Brister.
>
> Because we had gone this far and it looked suspicious enough, our manager was very adamant about the time frames, including producing phone records that showed where she was, you know, texting back and forth with her husband,

her story seemed pretty plausible to me.  So I thought this needs to be looked into further.

(Phillips Dep. at 66-67.)

So, on May 3, 2010, Plaintiff was suspended pending further investigation.

When Plaintiff's supervisor, Sean Brister, returned to work, Phillips debriefed her.  He told her that he sat in on the Investigator's interviews, summarized it as a "she said/she said," and let her know that he suspended Plaintiff pending further investigation.  (Phillips Dep. at 86.)

### F.  Events Occurring After 5/3/10 Suspension Pending Further Investigation

On May 10, 2010, Investigator Meisnitzer sent Plaintiff's RFI back to Mary Glass, giving her the information from his interviews.  (Meisnitzer Dep. at 46-47; Def.'s Ex. G, Investigative Rpt. at 23.)

On May 11, 2010, Mary Glass notified Investigator Meisnitzer that a final decision had been made on Plaintiff's FMLA leave taken on April 10, 2010.  Plaintiff was denied 4 hours of FMLA leave for that day.  He did not know and did not ask why Glass denied 4 hours as opposed to 1 or 1-1/2 hours, considering the earliest time that Kari Hasler claimed she saw Plaintiff.  (Meisnitzer Dep. at 74-75.)  It was entirely Mary Glass's decision to deny those 4 hours.  She, like the Investigator, admitted that she was aware of the time discrepancies in Kari Hasler's emails and was unaware of Plaintiff's specific medical conditions and restrictions at the time she made her decision.  She testified that she denied the entire afternoon of April 10, 2010 -- 4 hours -- because she assumed that attending a birthday party later that day was inconsistent with Plaintiff's medical conditions and apparently believed Kari Hasler's version of the facts despite her inconsistencies rather than Plaintiff's

12

version.  (Meisnitzer Dep. at 84; M. Glass Dep. at 26, 31, 66-79, 87-99, 105-113, 116-119, 122.)

On May 12, 2010, Investigator Meisnitzer prepared his Report of Investigation ("ROI"), got it approved, and distributed it.  (Def.'s Ex. G, ROI at 23.)  He testified that, other than Mary Glass's decision to deny Plaintiff 4 hours of FMLA leave on April 10, 2010, his Investigative Report was complete on May 3, 2010.  There was no further investigation. (Meisnitzer Dep. at 75-76.)

### G.  May 20, 2010 - Change to "Suspended Pending Termination"

On May 20, 2010, Defendant AT&T changed Plaintiff's employment status from "suspended pending further investigation," to "suspended pending termination."  (Def.'s Ex. G, Meisnitzer ROI at 24.)  That same day, Plaintiff's immediate supervisor, Sean Brister, sent Plaintiff a letter informing her that "[d]ue to the observation of suspected FMLA FRAUD you are now being Suspended Pending Termination of your employment with AT&T."  (Def.'s Ex. L.)  After receipt of the Investigator's Report, the senior manager and general manager make the decision with Defendant's Human Resources Department whether a change should be made in the employee's status to "suspended pending termination."  (Glenn Dep. at 58.)

On May 20, 2010, Plaintiff got a call from her union representative telling her about the status change in her employment, and a Review Board Hearing was scheduled for June 11, 2010.  (Pl.'s Dep. at 107-09.)

### H.  May 24, 2010 - Exit Package Prepared for Plaintiff

On May 24, 2010, Plaintiff's manager, Joseph Zmud, completed an exit package for Plaintiff, signed it, and dated it.  Mr. Zmud testified that an exit package is prepared at the

13

termination stage, not at the "Suspended Pending Termination" stage.  He admitted that he prepared Plaintiff's exit package before her Review Board Hearing that was scheduled for June 11, 2010 and before her June 17, 2010 termination.  (Zmud Dep. at 36-38; Pl.'s Ex. 12, 5/24/10 exit package; Pl.'s Ex. 13, 6/17/10 termination letter.)

At the end of May, 2010, Plaintiff got a phone call from a co-worker informing her that Plaintiff's manager, Joseph Zmud, had packed up all her personal belongings from her work area and asked this co-worker to take them to Plaintiff.  (Pl.'s Dep. at 113-14.)

### I.  June 11, 2010 - Plaintiff's Review Board Hearing

On June 8, 2010, Plaintiff obtained a letter from her treating physician, Dr. Cavataio, stating that she is under his care, takes several medications, and is able to do outside activities in the afternoon after her medication and/or rest.  (Def.'s Ex. P, 6/8/10 letter.)  She presented the letter to her union representative before her scheduled Review Board Hearing.  (Pl.'s Dep. at 138.)

On June 11, 2010, Plaintiff's Review Board Hearing took place.  Plaintiff, her union representative, the union president, and union vice president were present.  Sean Brister was also present.  Plaintiff was allowed to explain what happened on April 10, 2010.  (Pl.'s Dep. at 113, 115-18.)  Defendant's managers make the final decision whether to terminate, the union does not take part in that employment decision.  (Glenn Dep. at 59-60.)

From May 3, 2010 until June 11, 2010, no one from Defendant AT&T contacted Plaintiff for further questioning or asked her for additional documents.  (Pl.'s Dep. at 159-60.)

### J.  June 17, 2010 - Termination

On June 17, 2010, Plaintiff was terminated.

14

On September 27, 2010, Plaintiff sent a letter to Tracy Glenn requesting a complete copy of her personnel file.  (Def.'s Ex. O, 9/27/10 letter.)  Plaintiff ultimately got a copy of her personnel file in February or March of 2011.  (Glenn Dep. at 66.)

On November 23, 2010, Plaintiff filed this lawsuit.

## II.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;

15

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.   Analysis

The FMLA entitles an eligible employee to take up to twelve weeks of leave per year if the employee has a serious health condition that prevents the employee from performing the functions of her job.  *Branham v. Gannett Satellite Info. Network, Inc.*, 619 F.3d 563, 568 (6th Cir. 2010) (internal quotation marks and citations omitted).  "The FMLA provides a private right of action to employees to protect their rights to such leave under two different theories:"  (1) the interference or entitlement theory, and (2) the retaliation or discrimination theory.  *Id.*

Plaintiff's complaint alleges claims under both theories.  Specifically, she claims that Defendant unlawfully interfered with her FMLA rights when it denied four hours of FMLA leave for April 10, 2010 and unlawfully retaliated against her for using her FMLA leave on

16

April 10, 2010. Defendant brings this motion arguing that there was no interference because Plaintiff was not entitled to use those four hours in the afternoon of April 10, 2010 to attend a party; and there was no retaliation because Plaintiff was terminated for lying about the need for FMLA leave for those four afternoon hours on April 10, 2010, not because she took FMLA leave. The Court begins with an analysis of Plaintiff's interference claim.

### A.  FMLA Interference Claim

"The 'entitlement' or 'interference' theory is derived from the FMLA's creation of substantive rights. If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred." *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). "The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA . . . ." *Id.* "Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." *Id.*

To prevail on an interference claim, a plaintiff must establish that (1) she is an eligible employee; (2) the defendant is an employer; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled. *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). Only the fifth element is at issue here.

It is undisputed that Defendant denied Plaintiff four hours of FMLA benefits. The parties do, however, dispute whether Plaintiff was entitled to receive those FMLA benefits.

17

Defendant argues that she is not because she attended a party during the afternoon of her scheduled work tour.  Plaintiff denies that she did so.  Because a genuine issue of material fact exists on this core issue, Defendant's motion for summary judgment on Plaintiff's interference claim is denied.

Defendant also argues that the decision maker, Mary Glass, denied Plaintiff the four hours of FMLA leave based on Ms. Glass's honest belief that Plaintiff lied about the time she attended the Woolvett party, i.e., after her scheduled work hours.  Plaintiff responds that (1) the Sixth Circuit has not applied the honest belief defense to FMLA interference claims;[2] and (2) even if this Court found that the defense would apply, a reasonable jury

_____

[2]Although some district courts in the Sixth Circuit have applied the honest belief rule to FMLA interference claims, those decisions are not binding precedent. *See Reinwald v. The Huntington Nat'l Bank*, 684 F. Supp. 2d 975, 984-85 (S.D. Ohio 2010); *Tillman v. Ohio Bell Tele. Co.*, No. 3:09 CV 2351, 2011 WL 2682405, *5 (N.D. Ohio July 11, 2011).  Defendant does not cite to any Sixth Circuit decision holding that the rule does apply to FMLA interference claims.  The district court decisions that Defendant relies upon do not adequately address the Sixth Circuit's decision in *Smith* where it adopted the "honest belief" rule in the context of a disability discrimination claim.  The *Smith* court observed that "[t]he rationale behind the rule is that the focus of a discrimination suit is on the intent of the employer."  *Smith*, 155 F.3d at 806.  It explained:

> If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent.  In other words, arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*.

*Id.* (internal quotation marks and citations omitted).  While this rationale supports a claim based on discriminatory intent, it does not support an FMLA interference claim where the intent of the employer is irrelevant.  *See Arban*, 345 F.3d at 401 (observing that "[b]ecause the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.").

could not find that Defendant's decision maker, Ms. Glass, made a reasonably informed and considered decision before denying Plaintiff the four hours of FMLA leave.

This Court agrees with Plaintiff.  Even if this Court were to conclude that the "honest belief" rule applies to FMLA interference claims, Defendant cannot establish "its 'reasonable reliance' on the particularized facts that were before it at the time the decision was made" to deny Plaintiff her FMLA leave.  *See Braithwaite v. The Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).  Ms. Glass made the final decision to deny Plaintiff's FMLA leave on May 11, 2010.  She based her denial decision on the information Investigator Meisnitzer provided to her after concluding his interviews of Plaintiff, Kari Hasler, Connie Hayes, and Marybeth Woolvett.  Ms. Glass admitted that, at the time she made her decision, she was unaware of Plaintiff's specific medical conditions and restrictions.  Moreover, she testified that she was aware of the discrepancies in Kari Hasler's emails as to the time she saw Plaintiff at the Woolvett party, was aware that Marybeth could not say for certain what time Plaintiff was at her party, and was aware that Plaintiff consistently stated that she arrived at the party a few minutes before 6:00 p.m. -- after her scheduled work hours.  (Meisnitzer Dep. at 84; M. Glass Dep. at 26, 31, 66-79, 87-99, 105-113, 116-19, 122.)  Defendant's Port Huron Call Center Manager, Richard Phillips, considered the same information as Mary Glass and concluded that further investigation was required before a firm employment decision was made.  "What I knew, I had in front of me, was a she said/she said, and that just needed to be looked into further. . . .  [W]e have a statement from the management employee who observed her, we have a statement from [Plaintiff] who is saying that's not

true and we have Marybeth Woolvett who comes in and says I can't be for sure." (Phillips Dep. at 66-67, 71-72, 80-81, 83-84, 86.)

It is true, as Defendant asserts, that "[i]n deciding whether an employer reasonably relied on the particularized facts then before it, [the courts] do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Braithwaite*, 258 F.3d at 494. It is also true, however, that the employer's "honest belief" must be based on a "reasonably informed and considered decision." *Id.* In the context of this case, the essential question is whether Defendant's decision maker, Ms. Glass, had a reasonable basis to believe, on the date she made her decision, that Plaintiff had lied about the time she attended the Woolvett party. *See, e.g., Smith v. Chrysler Corp.*, 155 F.3d 799, 808 (6th Cir. 1998) (adopting the honest belief rule in the context of claimed violation of the Americans With Disabilities Act and allowing the defense to be used to rebut the plaintiff's claims of "pretext" in some instances but not others). As the Sixth Circuit observed in *Smith*:

> Although courts should resist attempting to micro-manage the process used by employers in making their employment decisions, neither should they blindly assume that an employer's description of its reasons is honest. When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process "unworthy of credence," then any reliance placed by the employer in such a process cannot be said to be honestly held.

*Smith*, 155 F.3d at 807-08.

As discussed above, Plaintiff has produced sufficient evidence here to establish that Defendant, through its decision maker Ms. Glass, failed to make a reasonably informed and

considered decision before denying Plaintiff four hours of FMLA leave on May 11, 2010. A reasonable jury could not conclude otherwise.

To summarize, assuming *arguendo* that the "honest belief" would apply to Plaintiff's FMLA interference claim, it would not apply under the facts presented here. Thus, as to Plaintiff's FMLA interference claim, the only issue that remains for trial is whether Plaintiff was entitled to the four hours of FMLA leave for April 10, 2010 that Defendant denied on May 11, 2010.

### B. FMLA Retaliation Claim

Unlike analysis of FMLA claims under the interference theory, "[u]nder the retaliation theory (also known as the discrimination theory), . . . the employer's motive *is* an integral part of the analysis." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). This is "because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Id.*

When analyzing a FMLA retaliation/discrimination claim, the courts apply the familiar *McDonnell Douglas* burden-shifting test. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To make out a prima facie case, a FMLA plaintiff must establish that: (1) she availed herself of a protected right under the FMLA by notifying her employer of her intent to take FMLA leave; (2) she suffered an adverse employment action; and (3) a causal connection exists between the exercise of her FMLA rights and her employer's adverse employment action. *Id.* If the FMLA plaintiff establishes a prima facie case, the burden shifts to her employer who must then proffer a legitimate, non-discriminatory reason for its adverse employment action. *Id.* If the employer carries this burden, then the plaintiff

21

must show that the employer's reason for her termination was a pretext for retaliating against the plaintiff for taking her FMLA leave. *Bell v. Prefix, Inc.*, 321 F. App'x 423, 426 (6th Cir. 2009); *Joostberns v. United Parcel Servs, Inc.*, 166 F. App'x 783, 790 (6th Cir. 2006).

The plaintiff generally shows pretext through one of three methods: (1) by showing that the proffered reason was false, i.e., that it "had no basis in fact"; (2) by showing that the proffered reason was insufficient to explain the adverse employment decision; or (3) by showing that the proffered reason was not the actual reason for that adverse employment action. *Id.* at 790-91, 794. If the plaintiff uses the first method, which "is essentially an attack on the credibility of the employer's proffered reason," the "honest belief" rule may be invoked. *Id.* at 791. It may not be invoked if plaintiff uses the other two methods. *Id.* at 794, n.5. "Where the employer can demonstrate an honest belief in its proffered reason, . . . the inference of pretext is not warranted." *Id.* at 791. "Under the honest belief rule, an employer's proffered reason is considered honestly held where the employer can establish that it reasonably relied on particularized facts that were before it at the time the decision was made." *Id.* (internal quotation marks and citation omitted). So, if the defendant employer invokes the "honest belief" rule, then "the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held." *Id.*

Defendant argues that Plaintiff cannot establish her FMLA retaliation claim. Specifically, Defendant argues that (1) because Plaintiff cannot establish a causal connection between her use of FMLA intermittent leave and her termination, she cannot establish a prima facie case of retaliation; (2) even if she could, Defendant has provided

22

a legitimate, non-discriminatory reason for her termination, i.e., she violated its Code of Business Conduct by lying about the time she was at the Woolvett party and thus lied about her abuse of her intermittent FMLA leave; and (3) she cannot show pretext because her supervisor, Sean Brister, made the decision to terminate by reasonably relying on the particularized facts in Investigator Meisnitzer's Investigative Report when concluding that Plaintiff was dishonest and thus violated Defendant's Code of Business Conduct.  Plaintiff argues the opposite -- not only is there sufficient evidence of a casual connection between her FMLA leave and termination, she presents evidence calling into question whether Defendant made a reasonably informed and considered decision before terminating her. This Court agrees with Plaintiff.

### 1.  Plaintiff Establishes a Prima Facie Case For FMLA Retaliation

Despite Defendant's arguments to the contrary, Plaintiff has established the third element of her prima facie case of retaliation -- that a causal connection exists between the exercise of her FMLA rights and her employer's adverse employment action.  Similar to the plaintiff in *Joostberns*, Plaintiff here provides evidence of (1) the temporal proximity of her use of FMLA leave and her termination; and (2) negative comments or conduct regarding Plaintiff's FMLA absences and FMLA absences in general by Defendant's managers and/or supervisors who may have influenced Sean Brister's decision to terminate Plaintiff.[3]  *See, e.g.*, R. Phillips Dep. at 7, 41, 45-49, 52-54, 68, 86 (testifying that an employee's

---

[3]In light of the Supreme Court's recent decision in *Staub v. Proctor Hospital*, ___ U.S. ___, 131 S. Ct. 1186 (2011), adopting the "cat's paw" theory of liability in discrimination cases, Defendant's argument that this Court cannot hold it liable for a non-decisionmaking supervisor/manager's discriminatory animus is rejected.

attendance, including FMLA protected absences are considered in employee evaluations, and testimony that he briefed Sean Brister on Plaintiff's FMLA fraud investigation and discussed the Investigator's report with her); Zmud Dep. at 26-27, 31, 36-38 (learned of suspected FMLA fraud from Kari Hasler; told Hasler that he was not surprised and long had the "impression" that Plaintiff "was not putting forth the effort" to come to work when she could; testified that, as Plaintiff's manager, he was part of the process that led to her termination; and admitted that he was told to prepare Plaintiff's exit package before her Review Board Hearing and notice of termination); T. Glenn Dep. at 22, 30-31, 36-38, 56-58, 60-61 (admitted that she can make recommendations regarding termination decisions and discussed Plaintiff's termination with Phillips, Mary Glass and others in management; admitted that she was involved in the FMLA fraud investigation process that led to Plaintiff's termination; testified that she had discussions with general manager Leiker about the number of employees on FMLA leave and that he expressed his opinion that the number of call-outs was too high); M. Glass Dep. at 20, 22-23, 107-112, 116-118, 122  (consulted with Defendant's legal department re: Plaintiff's suspected FMLA fraud; admitted that she denied four hours of Plaintiff's FMLA leave because Plaintiff attended a party and "we didn't have the exact time for when she was actually there or arrived there" so Glass assumed Plaintiff "could have been there earlier" than the evidence stated and thus denied the whole afternoon of April 10, 2010).

Consideration of the above evidence, in addition to the temporal proximity between Plaintiff's FMLA leave and termination, is sufficient to satisfy the third element of Plaintiff's prima facie FMLA retaliation case.

24

### 2.   A Genuine Issue of Material Fact Exists as to Pretext

The parties do not dispute that Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's termination -- that she violated Defendant's Code of Business Conduct because she lied about the time she was at the Woolvett party and thus was dishonest about her need for FMLA leave in the afternoon of April 10, 2010.  Rather, it is disputed whether Plaintiff produced evidence from which it could reasonably be inferred that Defendant's reason for her termination was a pretext for unlawful discrimination. Specifically, Plaintiff argues that a genuine issue of material fact exists whether Defendant made a reasonably informed and considered decision before terminating Plaintiff, "thereby making its decisional process 'unworthy of credence,'" and precluding a conclusion that Defendant's reliance on that process could be "honestly held."  *Smith*, 155 F.3d at 807-08.


In this case, the issue is not as Plaintiff claims -- whether Plaintiff's presence at a party on April 10, 2010 meant she could perform the essential functions of her job in light of the medical conditions and restrictions underlying her intermittent FMLA leave or, stated otherwise, whether she could attend a party after taking the day off as valid FMLA leave. Accordingly, Plaintiff's reliance on *Hyldahl v. AT&T*, No. 07-14948-BC, 2008 WL 5111910 (E.D. Mich. Dec. 4, 2008) (Ludington, J.), is misplaced.

The issue presented here is whether Defendant had an honest belief that Plaintiff misrepresented the time she was at the Woolvett party and misrepresented the entire time she took off on April 10, 2010 as valid FMLA leave.  Plaintiff presents evidence that supports her argument that Defendant's proffered reason is false and that Defendant failed

25

to make a reasonably informed and considered decision before terminating her, i.e., Zmud's testimony and exhibits showing that the paperwork for her termination was completed before she had the opportunity to convince Defendant at her Review Board Hearing that she had not lied about the time she attended the Woolvett party or about her valid use of FMLA leave on April 10, 2010, and Sean Brister's affidavit averring that she based her decision on the Investigative Report that contained no more substantive information than that available to Richard Phillips when he concluded that "further investigation" was required before Defendant could say for sure whether Plaintiff was being dishonest.  Plaintiff presents far more than her "bare assertion that the employer's proffered reason has no basis in fact." *Joostberns*, 166 F. Appx at 791.  Rather, she presents sufficient evidence "to call [her] employer's honest belief into question." *Id.*  As the Sixth Circuit instructed in *Smith*, "[a]lthough courts should resist attempting to micro-manage the process used by employers in making employment decisions, neither should they blindly assume that an employer's description of its reasons is honest."  *Smith*, 155 F.3d at 807-08.

   The key question in this case is whether Defendant had a reasonable basis to believe Plaintiff lied when she said she attended the Woolvott party after her work shift was over and that she took intermittent FMLA leave on April 10, 2010 for valid reasons.  Based on the evidence Plaintiff presents, a genuine issue of material fact exists on this key question. Accordingly, Defendant's motion for summary judgment on Plaintiff's FMLA retaliation claim is denied.

## IV.  Conclusion

26

For the above stated reasons, Defendant's motion for summary judgment is GRANTED as to Plaintiff's Bullard-Plawecki Employee Right to Know claim, and DENIED as to Plaintiff's FMLA claims.

s/Nancy G. Edmunds_____
Nancy G. Edmunds
United States District Judge

Dated:  November 15, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 15, 2011, by electronic and/or ordinary mail.

s/Carol A. Hemeyer_____
Case Manager